**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CHARLES RAY FERGUSON,**

      **Plaintiff,**

**v.**                               **Case No.: 3:11-cv-00423**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. This case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 10, 13).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 11, 12).

The Court has fully considered the evidence and the arguments of counsel.  For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.  Procedural History

Plaintiff, Charles Ray Ferguson (hereinafter referred to as "Claimant"), sought Social Security benefits on two occasions. His first applications were filed on October

23, 2003 and requested both SSI and disability insurance benefits ("DIB").  (Tr. at 15).

These applications were denied initially and upon reconsideration. Claimant requested a

hearing before an Administrative Law Judge ("ALJ"), which was conducted on January

16, 2006. (Tr. at 57). On July 25, 2006, the ALJ issued a written opinion denying

Claimant's applications. (Tr. at 57-66). Claimant did not seek review of the ALJ's

decision, and it became the final decision of the Commissioner.

Claimant filed the present application for SSI[1] on August 30, 2006, alleging

disability beginning on that same date due to "skin cancer, chest pains, and sleeping

disorder." (Tr. at 142). The claim was denied initially and upon reconsideration. (Tr. at

15). The Claimant then requested a hearing before an Administrative Law Judge, which

was held on December 16, 2008 before the Honorable Rosanne M. Dummer, ALJ. (Tr.

at 27-52). By decision dated February 25, 2009, the ALJ determined that Claimant was

not entitled to benefits. (Tr. at 15-26). The ALJ's decision became the final decision of

the Commissioner on April 12, 2011 when the Appeals Council denied Claimant's

request for review. (Tr. at 1-3).

On June 16, 2011, Claimant brought the present civil action seeking judicial review

of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The

Commissioner filed his Answer and a Transcript of the Proceedings on September 15,

2011. (ECF Nos. 7, 8). The parties filed their briefs in support of judgment on the

pleadings on February 6, 2012 and March 5, 2012. (ECF Nos. 10, 13). Therefore, this

matter is fully briefed and ready for disposition.

---

[1] Claimant's last insured date for disability insurance benefits was December 31, 2004.  (Tr. at 65)
Accordingly, Claimant no longer qualified for DIB at the time of his second application.

## II.   <u>Claimant's Background</u>

Claimant was fifty one (51) years old at the time of the administrative hearing. (Tr. at 31). He completed the eleventh grade in school and subsequently obtained a GED.  (Tr. at 32). Claimant's work history included asbestos removal and heavy labor. (Tr. at 143). He last worked on a full-time basis in 1995, but continued to perform odd jobs for income, such as mowing grass, laying carpet, and working on automobiles. (Tr. at 32, 33). Claimant lived alone and attended to his daily grooming and household chores independently. (Tr. at 118-20).

## III.   <u>Relevant Medical Records</u>

The Court reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issues in dispute or provide a clearer understanding of Claimant's medical background.

### A.   **Records Prepared Prior to Alleged Onset of Disability**

In late 2003, Claimant was evaluated for chest pain. (Tr. at 329-331). An exercise stress test showed a normal EKG; normal functional capacity; appropriate response to exercise; normal resting blood pressure; and no arrhythmias. A myocardial perfusion SPECT scan revealed no wall motion abnormalities and a near normal ejection fraction of 49%. There was no evidence of stress-induced ischemia, no perfusion defects, and no other significant findings. A subsequent CT scan of the chest taken in August 2004 was unremarkable, with no lung or heart abnormalities. The scan did reveal, as an incidental finding, that Claimant had a fatty liver.

The records reflect that during the year of 2005 Claimant's primary care physician, Dr. Randall Hawkins, evaluated Claimant on multiple occasions for liver

- 3 -

disease and other chronic conditions. (Tr. at 206-217). Claimant was repeatedly instructed to stop drinking alcohol. Claimant also developed shingles and complained of depression. Dr. Hawkins prescribed various medications to treat Claimant's symptoms, including Lortab, antibiotics, Valtrex, and Librium. On March 9, 2005, Dr. Hawkins referred Claimant to Dr. Vinay Vermani, an oncologist/hematologist, for follow up of abnormal blood test results.  (Tr. at 182-83). Dr. Vermani documented that Claimant had elevated liver enzymes and a slightly elevated white blood count. Claimant complained of fatigue, intermittent wheezing, nausea, vomiting, diarrhea and difficulty falling asleep. He admitted to drinking six beers and smoking two packs of cigarettes each day. On physical examination, Dr. Vermani found decreased breath sounds bilaterally with no rales or wheezing. The remainder of the examination was normal. Dr. Vermani diagnosed alcohol and tobacco abuse by history and COPD. He recommended a liver/spleen scan, chest x-ray, and some additional laboratory tests.  Dr. Vermani also counseled Claimant to quit drinking alcohol and to stop smoking.

On April 13, 2005, Claimant returned to Dr. Vermani's office for review of the test results. (Tr. at 181). Dr. Vermani advised Claimant that his liver scan showed evidence of hepatic dysfunction and his laboratory studies reflected liver disease secondary to portal hypertension secondary to alcohol-induced cirrhosis. Dr. Vermani again encouraged Claimant to stop drinking in view of his liver disease. Claimant was told to return in July for re-evaluation. Claimant did return as instructed on July 20, 2005.  (Tr. at 180). On this visit, Dr. Vermani diagnosed Claimant with shingles and prescribed lotion and medication. He recorded that Claimant's skin color appeared copper-colored and explained to Claimant that some of his blood work was abnormal. Dr. Vermani stressed that Claimant needed to stop drinking because his liver was already damaged.

On September 21, 2005, Claimant was hospitalized at Pleasant Valley Hospital in Point Pleasant, West Virginia for persistent shingles and liver disease. (Tr. at 293-296). During the admission, Claimant was treated with intravenous medication for his shingles and oral medication for withdrawal from alcohol. Dr. Hawkins cared for Claimant during this admission and had a long discussion with him regarding his need to abstain from drinking. Claimant was discharged on September 25, 2005 and saw Dr. Vermani in follow-up three days later. (Tr. at 179). Dr. Vermani noted that Claimant's shingles were healing, but he still had a copper tint to his skin. Dr. Vermani scheduled Claimant too see a liver specialist and told him not to drink alcohol anymore.

On January 13, 2006, Claimant presented to Dr. Hawkins's office with complaints of having a stomach virus. (Tr. at 205). He told Dr. Hawkins that he needed a physical examination for disability and welfare claims. The following day, Dr. Hawkins admitted Claimant to Pleasant Valley Hospital for increasing complaints of pain, cramping, and diarrhea. (Tr. at 290-291). On physical examination, Dr. Hawkins found Claimant to have skin changes secondary to chronic liver disease; however, his lungs, heart, mood/affect, and neurological system were normal. Dr. Hawkins suspected that Claimant's abdominal symptoms were caused by an exacerbation of his liver disease. He was treated with intravenous fluids and monitoring. His condition improved and was described as stable two days later when he was discharged.

On March 3, 2006, Dr. Hawkins performed a physical examination of Claimant for the West Virginia Department of Health and Human Resources ("WVDHHR"). (Tr. at 325-26). Claimant's blood pressure was measured at 141/88; he was found to have heart palpitations, anxiety, depression, degenerative disc disease, and alcoholic liver disease. Dr. Hawkins recorded that Claimant had chest pain, shortness of breath, and

angina. His primary diagnoses were chronic liver disease and angina. Dr. Hawkins opined that Claimant was unable to work at any occupation and would remain unable to work full-time for a period in excess of one year.

On May 18, 2006, Claimant consulted with Dr. John Wade, an otolaryngologist, for a painful lesion on his neck. (Tr. at 187-88). The lesion subsequently ulcerated, causing Dr. Wade to suspect a malignancy. (Tr. at 185-86). Dr. Wade surgically removed the lesion, and the resulting pathology report indicated that the lesion was not cancerous. (Tr. at 259).

Claimant returned to Dr. Hawkins's office on June 13, 2006 complaining of depression. (Tr. at 199-200). A review of systems elicited additional complaints of vision changes, frequent nausea, angina, shortness of breath, cough, abdominal pain, and anxiety; however, his physical examination revealed no abnormal findings. Dr. Hawkins noted that Claimant continued to smoke and drink alcohol. He diagnosed Claimant with liver disease. Three days later, Dr. Hawkins admitted Claimant to Pleasant Valley Hospital for increasing chest pain, severe weakness, and shortness of breath. (Tr. at 271-73). On a review of systems, Claimant expressed no other complaints and his physical examination was normal except for mild tenderness in the abdomen and skin discoloration from chronic iron overload secondary to chronic liver disease. Dr. Hawkins ordered blood work, including cardiac enzymes and troponin levels for evidence of a myocardial infarction. The tests were negative for a cardiac injury. (Tr. at 260-66). The EKG studies were also normal.

### B.    Treatment Records Prepared During the Relevant Time Frame

Claimant presented to Dr. Hawkins's office on October 16, 2006 complaining of chest pain and tightness and abdominal pain. (Tr. at 195-96). On a review of systems,

Claimant indicated that he also had fever/chills, angina, shortness of breath, frequent nausea, vomiting, diarrhea, lumbar syndrome, swelling of the abdomen, depression, and anxiety. Dr. Hawkins diagnosed liver disease and degenerative disc disease. On re-examination in November 2006, Claimant's condition was essentially unchanged. (Tr. at 411-12). Claimant did indicate that taking pain medications helped. After performing a physical examination, Dr. Hawkins concluded that Claimant's findings were chronic.

Claimant saw Dr. Hawkins in follow-up on January 8, 2007 and January 17, 2007, when Dr. Hawkins admitted Claimant to Pleasant Valley Hospital for complaints of increasing nausea, vomiting, and diarrhea. (Tr. at 250-51, 409-10). Claimant was extremely weak with shortness of breath. On physical examination, Claimant had an elevated blood pressure and was mildly anxious; otherwise, the examination was normal. Dr. Hawkins surmised that Claimant had a virus and ordered intravenous fluids and a chest x-ray. The chest x-ray showed changes consistent with bronchitis and COPD. (Tr. at 255). The remaining workup was "pretty much unremarkable." (Tr. at 248). Claimant was discharged on January 19, 2007 in stable condition. Thereafter, Dr. Hawkins saw Claimant in his office for follow-up. (Tr. at 398-408). Claimant's chronic conditions remained essentially unchanged during the remainder of 2007.

On March 16, 2008, Claimant went to the emergency room at Pleasant Valley Hospital with complaints of nausea, vomiting, diarrhea, and cough. (Tr. at 352-53). He told the emergency room physician, Dr. Casto, that he had been having symptoms for three days and was unable to keep any food down. Claimant admitted to smoking one pack of cigarettes per day and drinking alcohol, "but not a great deal." The review of Claimant's systems was negative. His physical examination revealed a slightly elevated blood pressure, a slight temperature, and an increased lung diameter with expiratory

wheezing. Claimant had no back tenderness with a normal range of motion, an intact neurological system, and normal mood/affect. A chest x-ray showed no acute process and influenza A and B testing was negative. Claimant was diagnosed with elevated liver enzymes, abdominal pain, and hyponatremia (insufficient sodium in body fluids). He was started on intravenous fluids. A CT scan of the abdomen was ordered, as well as laboratory studies, and he was admitted to Dr. Hawkins for further treatment. The CT scan demonstrated a low density area of the lateral right lobe of the liver, but the remaining structures were normal with no evidence of an acute intra-abdominal or pelvic process. (Tr. at 385-86). A follow-up scan done two days later showed a right renal cyst with some vascular calcification; however, the low density area of the right lobe of the liver seen earlier could no longer be detected.  (Tr. at 383-84).

On July 24, 2008, Claimant returned to Dr. Hawkins's office for a routine recheck and to discuss some lesions on his face. (Tr. at 368-69). Dr. Hawkins referred Claimant to Dr. Stephen Rerych, a general surgeon. (Tr. at 365). Dr. Rerych noted that Claimant had two lesions over the left maxillary area and left eyebrow. They had been present for nine months and were growing. Dr. Rerych scheduled incisional biopsies of the lesions. Preoperatively, Claimant underwent a physical examination by Dr. Hawkins, which was essentially normal, as well as a chest x-ray and EKG. (Tr. at 359, 364, 367, 345-47). The chest x-ray showed no evidence of acute pulmonary problems and the heart was a normal size. However, the EKG indicated possible left atrial enlargement and left ventricular hypertrophy.

Dr. Rerych proceeded with surgery on September 2, 2008. (Tr. at 348-49). He removed the lesions and submitted them to the pathology department. The following day, the surgical pathology report was completed and indicated that the lesions were not

cancerous. (Tr. at 350-51). At Claimant's postoperative visit with Dr. Rerych, the surgical wounds were healing well with no signs of infection. (Tr. at 344). Dr. Rerych dismissed Claimant from his care.

On October 9, 2008, Claimant began treatment with Dr. Danny Westmoreland. (Tr. at 176). Claimant reported that he had shortness of breath, a bad liver, pain in both legs, pain in his lower abdomen, and pain in his low back. Dr. Westmoreland performed a physical examination and prescribed Lortab, Xanax, and Advair. Dr. Westmoreland saw Claimant on two more occasions in 2008 and five times between January and April 2009. (Tr. at 173-76). During this period, Claimant's complaints remained essentially the same. On April 9, 2009, at Claimant's request, Dr. Westmoreland completed a Medical Assessment of Ability to do Work-Related Activities (Physical). (Tr. at 415-17). In this form, Dr. Westmoreland opined that Claimant was limited to lifting/carrying 20 pounds frequently and 30 pounds occasionally. He was able to stand one hour without interruption in an 8-hour workday; could sit four hours in an 8-hour work day, but only 1 hour without interruption; he could never climb, stoop, crouch, kneel, or crawl, and could occasionally balance; he could handle, feel, hear and speak without limitation; he had environmental restrictions that affected his ability to be near heights or moving machinery; and he was further restricted in his ability to tolerate temperature extremes, chemicals, dust, fumes, humidity, and vibration. Dr. Westmoreland did not provide any explanation or medical findings to support his opinions. He recommended an MRI of Claimant's lumbar spine.

On March 29, 2010, Claimant had x-rays performed on his lumbar spine. (Tr. at 414). Five views were taken and showed an old compression fracture at the T/12. The vertebral body heights were observed to be maintained and there was no significant disc

space narrowing.

### C.    Agency Evaluations

On November 3, 2006, Dr. A. Rafael Gomez completed a Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 220-27). He concluded that Claimant did not have a severe impairment. In addition, Dr. Gomez opined that Claimant was not fully credible, pointing out that Claimant claimed to have skin cancer when the biopsies were all negative for malignancy.

Catherine Van Verth Sayre, M.A., performed an adult mental status examination of Claimant on December 5, 2006. (Tr. at 228-31). She generally observed that Claimant was appropriately groomed, although he smelled strongly of cigarette smoke. He had a good attitude and was cooperative. Claimant reported that he applied for disability because he was dying of skin cancer and had suffered from depression for around twenty years. He described feeling tired and hopeless, indicating that he had trouble sleeping and ate infrequently. He told Ms. Sayre that he had tried to commit suicide twenty years earlier after a divorce and still had thoughts of dying, but denied any current suicidal or homicidal ideations. Claimant indicated that he had never received mental health treatment. When questioned about his substance abuse history, Claimant admitted to drinking twelve beers per day and stated that he had been charged at least five times for DUI and three times for public intoxication. He also smoked around two packs of cigarettes per day and drank around two pots of coffee. He also confided that he previously smoked marijuana, but had not done so for a long while.

Ms. Sayre noted that Claimant's speech was clear; he was oriented to all spheres; his stream of thought was normal and his thought content revealed no evidence of hallucinations or illusions. Claimant's mood was depressed and his affect was restricted.

Ms. Sayre felt that Claimant had severely impaired judgment, but his insight was fair. Claimant's immediate, recent, and remote memories were intact. His social functioning, persistence and pace were normal, and his concentration was mildly impaired. Ms. Sayre diagnosed Claimant with Major Depressive Disorder, recurrent and moderate, and alcohol dependence. She felt his prognosis was fair, although she did not think he was capable of managing his own benefits.

Based upon Ms. Sayre's evaluation, Dr. Rosemary Smith completed a Psychiatric Review Technique ("PRT") on December 18, 2006. (Tr. at 234-47). Dr. Smith found that Claimant had an affective disorder and a substance addiction disorder, but did not find his impairments to be severe. According to Dr. Smith, Claimant had no limitations in activities of daily living or social functioning. He was mildly restricted in maintaining concentration, persistence and pace and had no episodes of decompensation of extended duration. Dr. Smith found no evidence of paragraph C criteria. Dr. Smith's assessment was reviewed by Dr. John Todd on February 6, 2007, who agreed with her opinions.  (Tr. at 308).

A second Physical Residual Functional Capacity Assessment form was completed by Dr. Rosalind Go on April 27, 2007.  (Tr. at 311-18).  Like Dr. Gomez, Dr. Go found no evidence of severe impairments. She opined that Claimant was only partially credible because the medical records did not support the severity of limitations claimed by him.

## IV.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d) (5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See *Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 416.920(a).

The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If the impairment does not, the adjudicator must determine the claimant's residual functional capacity, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to establish, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity. *Id.* § 416.920(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical and mental shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 416.920a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a (c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. *Id.* §416.920a(d)(3).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since August 30, 2006, the date the application was filed. (Tr. at 18, Finding No. 1). Under the second inquiry, the ALJ found that Claimant suffered from the severe impairments of

polysubstance abuse, chronic obstructive pulmonary disease ("COPD"), limited vision, and alcoholic hepatitis. The ALJ considered Claimant's other claimed impairments, including skin lesions, carpal tunnel syndrome, sleep disorder, and a back condition, but found none of them to be severe.  (*Id.*, Finding No. 2).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 19-20, Finding No. 3). The ALJ then found that Claimant had the following residual functional capacity (hereinafter referred to as "RFC"):

> [M]edium work as defined in 20 C.F.R. § 416.967(c) involving lifting 50 pounds occasionally and 25 pounds frequently.  The claimant must avoid excessive exposure to dust, fumes, gases, temperature extremes, and the hazards of work involving unprotected heights, or work involving dangerous, moving machinery.  He can only occasionally climb; and he must avoid work requiring depth perception or peripheral vision to the left. Secondary to exacerbations of more than two times a month, due to polysubstance abuse, the claimant would be unable to maintain concentration, pace, or task persistence.

(Tr. at 20, Finding No. 4).

As a result, Claimant could not return to his past relevant employment. (Tr. at 21, Finding No. 5). The ALJ considered that Claimant was fifty-one years old at the time of the decision, which qualifies as "closely approaching advanced age;" he had a high school education and could communicate in English. (Tr. at 121 Finding Nos. 6 and 7). She noted that Claimant's prior work was unskilled; therefore, transferability of job skills was not an issue. (*Id.*, Finding No. 8). Based on the evidence of record, the testimony of a vocational expert, and Claimant's impairments, including polysubstance abuse, the ALJ concluded that no jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. at 21-22, Finding No. 9). Nonetheless, the ALJ noted that under section 105 of Public Law 104-121, benefits could not be paid if

drug or alcohol dependency was a material factor to the finding of disability. Accordingly, the ALJ was required to determine whether Claimant would still be disabled if he stopped alcohol use. The ALJ considered Claimant's impairments and found that Claimant's poor vision, COPD, and liver disease would continue to be severe even if Claimant stopped all alcohol intake; however, these impairments, alone or in combination, did not meet or medically equal a listed impairment. (Tr. at 22-23, Finding Nos. 10 and 11). The ALJ then reviewed Claimant's RFC, identifying the restrictions that related solely to Claimant's substance abuse. After determining that the limitations involving Claimant's concentration, pace, and persistence were entirely due to his alcohol use, the ALJ eliminated those restrictions from the RFC finding. (Tr. at 23-24, Finding No. 12). She noted that even after removing substance abuse as a factor, Claimant could not perform his past relevant work and transferability of job skills was not an issue. (Tr. at 24-25, Finding Nos. 13 and 14). The ALJ elicited the opinions of a vocational expert and relying upon that testimony, she found that there were significant numbers of jobs in the national economy at the medium, light and sedentary exertional levels that Claimant could perform if he stopped abusing alcohol. (Tr. at 25-26, Finding No. 15). Accordingly, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 26, Finding No. 16).

## V.     Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ improperly afforded controlling weight to the RFC finding contained in the July 2006 decision denying Claimant's first applications for benefits. According to Claimant, the ALJ in the instant action simply adopted the prior RFC finding without determining its appropriate weight under the factors set forth in

Acquiescence Ruling 00-1(4). Claimant urges that given the length of time between the two decisions (two years and seven months), the ALJ's wholesale reliance on the prior RFC assessment was unreasonable. Second, Claimant argues that the ALJ erred by failing to order a consultative examination of Claimant as he requested. Claimant contends that the ALJ had vastly different expert opinions in the record and should have ordered an updated examination to resolve the apparent ambiguities and conflicts before adopting an outdated RFC finding.

## VI.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). A reviewing court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Ultimately, the question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner is well-

grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

## VII.  <u>Analysis</u>

### A.  **Application of Acquiescence Ruling 00-1(4)**

Claimant contends that the ALJ erred when giving controlling weight to the RFC finding made by the prior ALJ in the July 2006 adjudication. In particular, Claimant asserts that the ALJ failed to "perform the three factor analysis mentioned" in Acquiescence Ruling 00-1(4). Acquiescence Ruling 00-1(4) provides, in relevant part:

> [W]hen adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.[2]

Contrary to Claimant's position, the Court finds that the ALJ properly adhered to the directives of Acquiescence Ruling 00-1(4), *Lively v. Secretary of Health and Human Services,* 820 F.2d 1391 (4th Cir. 1987), and *Albright v. Commissioner of Social Security Administration,* 174 F.3d 473 (4th Cir. 1999) when making the RFC finding in

---

[2] Acquiescence Ruling 00-1(4) applies only to cases pending in the Fourth Circuit and explains how the SSA will apply the holdings made in *Lively v. Secretary of Health and Human Services,* 820 F.2d 1391 (4th Cir. 1987) and *Albright v. Commissioner of Social Security Administration,* 174 F.3d 473 (4th Cir. 1999). Both of these cases involve the treatment of prior findings by an ALJ when determining the validity of a subsequent claim for benefits made by the same applicant.

this case. Acquiescence Ruling 00-1(4) does not explicitly require the ALJ to provide a detailed written explanation of her analysis, setting out with particularity her thoughts on each of the three factors mentioned in the Ruling. Instead, the Ruling and the cases require the ALJ to consider the prior finding as evidence and weigh it in light of the relevant facts and circumstances.

In the instant action, the ALJ clearly considered and weighed the July 2006 RFC finding. First, she examined the prior ALJ's identification of Claimant's severe impairments, noting that he found Claimant to have polysubstance abuse, COPD, liver disease, and limited vision. Examining the evidence, the ALJ indicated that Claimant continued to drink alcohol and receive treatment for alcoholic hepatitis and COPD. Claimant also continued to wear glasses for reading due to his visual limitations. The ALJ concluded that these conditions had not improved with the passage of time; therefore, they continued to be severe impairments. (Tr. at 18). Next, the ALJ reviewed the RFC finding made in the prior adjudication. She noted that the medical evidence failed to "establish worsening or improvement in the claimant's medical impairments since the previous Administrative Law Judge Decision was issued on July 25, 2006." (Tr. at 20). As a result, the ALJ gave the prior RFC finding "great weight" and adopted it in its entirety. (*Id.*). Nevertheless, the ALJ further acknowledged that a psychological evaluation conducted after the prior decision revealed that Claimant drank twelve beers each day, was depressed, and had severely impaired judgment and mildly impaired concentration. For that reason, the ALJ supplemented the prior RFC assessment to account for Claimant's recent treatment and evaluation related to alcohol intake. The ALJ included an additional restriction targeted at Claimant's periodic exacerbations of symptoms related to alcohol use and liver disease, finding that more than two times a

month, Claimant "would not be able to maintain concentration, pace, or task persistence." (Tr. at 20). The ALJ expressly confirmed that she considered and applied Acquiescence Ruling 00-1(4) and the applicable Fourth Circuit cases in crafting her RFC finding.

The RFC assessment by the ALJ is consistent with the Social Security regulations and rulings and is supported by substantial evidence. The 2006 decision established Claimant's RFC for the period of August 1, 2001 through July 25, 2006. The application at issue in this case claimed a disability onset date of August 30, 2006, *just one month and a few days after the first adjudication*. Although the ALJ did not issue her opinion until February 25, 2009, the medical records prepared during the interim two year and seven month period simply did not reflect a significant deterioration of Claimant's physical or mental condition. Claimant correctly states that his medical problems were not "static" during that time frame; however, the vast majority of the medical care rendered to Claimant after the first adjudication was simply a continuation of the treatment he had previously received for periodic exacerbations of his liver disease. Even still, these episodic aggravations did not result in any major, long-term changes in Claimant's treatment regimen or instructions. Claimant was repeatedly advised by his treating physicians that he had to stop all alcoholic intake to improve his health and allow his liver to rest. Rather than take that advice, Claimant continued to drink, which invariably resulted in the need for short-term hospitalizations for abdominal pain, cramping, nausea, diarrhea, and vomiting, all symptoms of alcoholic liver disease.[3] Claimant also received treatment related to skin lesions, which he claimed were

---

[3] *Alcoholic Liver Disease,* Medline Plus, copyright 1997-2012,, A.D.A.M., Inc., a service of the U.S. National Library of Medicine, National Institutes of Health.

cancerous, but which were, in fact, benign. These lesions were surgically removed without complication or subsequent physical limitation. Accordingly, although the ALJ did not provide a detailed explanation of her analysis under Acquiescence Ruling 00-1(4), the Court finds that no prejudice resulted to Claimant as the ALJ's ultimate decision was well-supported by the evidence.

### B.    Need for a Consultative Examination

Claimant next contends that the ALJ should have granted his request for a consultative examination given the passage of more than two years between the prior adjudication and the administrative hearing in the present case. Relying on 20 C.F.R. § 416.919a(b)(4),[4] Claimant points to conflicting medical source opinions in the record and argues that the sheer incompatibility of these opinions mandated the input of an updated consultative examination.

---

[4] When reviewing Claimant's argument, the Court considered the version of 20 C.F.R. § 416.919a(b) in effect at the time the ALJ's decision became the final decision of the Commissioner. Effective March 26, 2012, however, the regulation was amended and the language upon which Claimant relies was omitted in the revised version. The relevant section currently reads as follows:

**§ 416.919a When we will purchase a consultative examination and how we will use it.**

(a) General. If we cannot get the information we need from your medical sources, we may decide to purchase a consultative examination. See § 416.912 for the procedures we will follow to obtain evidence from your medical sources and § 416.920b for how we consider evidence. Before purchasing a consultative examination, we will consider not only existing medical reports, but also the disability interview form containing your allegations as well as other pertinent evidence in your file.

(b) Situations that may require a consultative examination. We may purchase a consultative examination to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:

(1) The additional evidence needed is not contained in the records of your medical sources;

(2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;

(3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or

(4) There is an indication of a change in your condition that is likely to affect your ability to work, or, if you are a child, your functioning, but the current severity of your impairment is not established.

20 C.F.R. § 416.919a(b) addresses when the SSA will purchase a consultative examination stating in relevant part:

> A consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim. Other situations, including but not limited to the situations listed below, will normally require a consultative examination:
>
> (1) The additional evidence needed is not contained in the records of your medical sources;
>
> (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
>
> (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources;
>
> (4) A conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved, and we are unable to do so by recontacting your medical source; or
>
> (5) There is an indication of a change in your condition that is likely to affect your ability to work, or, if you are a child, your functioning, but the current severity of your impairment is not established.

20 C.F.R. § 416.919a(b). "The ALJ has complete discretion over consultative testing, and such tests are only necessary to make an informed decision about disability." *Stanton v. Appel,* 2000 WL 1005817 *8 (S.D. Ala. July 5, 2000) (citing *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir. 1984); *see, also, Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) (An ALJ is not required to order a consultative examination "unless the record establishes that such an examination is *necessary* to enable the [ALJ] to make the disability decision," quoting *Turner v. Califano,* 563 F.2d 669, 671 (5th Cir. 1997); *Hayes v. Astrue*, 2009 WL 890053 (E.D. Tenn. March 30, 2009) ("The plain language of the [20 C.F.R. § 416.919a(b)] indicates that the decision whether to order consultative examinations is firmly within the Commissioner's discretion, and thereby, ALJ's discretion."); *Jones v. Astrue,* 2011 WL 4064217 *2 (D. Md. Sept. 12, 2011) ("The ALJ is vested with discretionary power in determining

whether a consultative examination is necessary."); *Brown v. Astrue,* 2012 WL 2953213 (W.D.N.Y. July 19, 2012) ("[C]onsultative examination is unnecessary if the record contains sufficient information on which to base the decision.").

Here, the ALJ carefully considered Claimant's request for a consultative examination and determined that the record as a whole provided sufficient information upon which to make a full and fair determination. (Tr. at 25-26). The Court agrees that the evidence before the ALJ was more than adequate to make an informed decision about disability. Claimant's treatment records prepared during the relevant time frame included notes from numerous office visits with Dr. Hawkins; records from a hospitalization at Pleasant Valley Hospital; laboratory reports; a CT scan of the abdomen and pelvis; pulmonary function studies; a mental status examination; multiple chest x-rays; a clinical hematology consultation report; records regarding Claimant's pre-operative work-up, which included an EKG report; surgical records and pathology reports; and a complete history and physical examination performed in conjunction with an emergency room visit. Claimant's historical records included notes from physician office visits; hospital records; a myocardial perfusion scan and stress test report; CT scans of the chest, liver, and spleen; pulmonary function studies; multiple EKG reports; routine laboratory reports, including complete blood counts and metabolic panels; evaluations by a hematologist and gastroenterologist; and chest x-rays. These records provided a longitudinal view of Claimant's medical condition and treatment for a six year period prior to the ALJ's written decision. In addition, the ALJ had several Adult Function Reports, the prior adjudication, four residual functional capacity assessments completed by agency experts; the RFC assessment of Dr. Hawkins, and the testimony of Claimant and a vocational expert. Contrary to Claimant's assertions, the

objective medical findings, the subjective statements of Claimant, the opinions of the treating sources and the agency consultants, and the testimony of the vocational expert were clear and, for the most part, internally unambiguous. Likewise, no perceptible gaps existed in the medical information and, thus, the ALJ was able to easily measure the change in Claimant's condition over the years. While the agency consultants found Claimant less restricted than outlined in the July 2006 RFC finding and disagreed with Dr. Hawkins about the severity of the physical and mental restrictions suffered by Claimant, there was no inconsistency or conflict regarding the nature and history of Claimant's medical conditions. The ALJ fully reviewed the evidence and weighed the opinions in light of the record as a whole. In doing so, the ALJ concluded that the existing evidence was adequate for reaching a determination of Claimant's RFC, which then allowed the vocational expert to evaluate the availability of suitable jobs in the national economy. Given the extent of the evidence presented to the ALJ, the Court does not find error in the ALJ's discretio    n not to order a consultative examination. Moreover, in light of the objective testing present in the record, the well-documented history of Claimant's impairments, and the subjective statements of Claimant, he is hard-pressed to demonstrate that a consultative evaluation may reasonably have changed the decision in this case. For these reasons, the Court finds Claimant's challenge to be without merit.

**VIII.  <u>Conclusion</u>**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to the Plaintiff and counsel of record.

**ENTERED**:  August 7, 2012.

Cheryl A. Eifert
United States Magistrate Judge